# EXHIBIT A

{00005310.1}

**COSTELLO & MAINS, P.C.**
By: Kevin M. Costello
2090 East Route 70
Cherry Hill, New Jersey 08003
(856) 751-3737



FILED
SEP 4 2009
CAMDEN COUNTY SUPERIOR COURT

| | |
|---|---|
| ASHLEY N. HUGHES | SUPERIOR COURT OF NEW JERSEY CAMDEN COUNTY-LAW DIVISION |
| Plaintiff, | |
| vs. | Civil Action<br>DOCKET NO. L-4477-09 |
| HOME DEPOT, AND JOHN DOES 1-5 6-10, | COMPLAINT AND JURY DEMAND |
| Defendants. | |

Plaintiff, Ashley N. Hughes, residing in Pennsgrove, New Jersey, by way of Complaint against the defendants, says:

### Preliminary Statement

Plaintiff brings this claim under the New Jersey Law Against Discrimination ("LAD") alleging gender orientation harassment, perceived gender orientation harassment, sexual orientation harassment, perceived sexual orientation harassment, and gender and/or sex based harassment.

Plaintiff also contends retaliatory discharge covered by the pretext of discharge based upon attendance.

### Identification of Parties

1. Plaintiff Ashley N. Hughes is, at all relevant times herein, a resident of the State of New Jersey and was an employee of the defendants.

2. Defendant Home Depot is, at all relevant times herein, a corporate entity doing business in Lawnside, New Jersey, where it employed the plaintiff.

3. Defendants John Does 1-5 and 6-10, currently unidentified, are individuals and/or entities who on the basis of their direct acts or on the basis of *respondeat superior*, are answerable to the plaintiff.

### General Allegations

4. Plaintiff is a female person who was born "inter-sexed" and or a "partial hermaphrodite."

5. Plaintiff identifies as, alternatively, transsexual, inter-sexed and/or hermaphroditic, depending on the context of the communication which plaintiff is being forced to identify her gender and/or orientation.

6. All harassment, discrimination and retaliation alleged here is alleged to be, in combination and/or singly motivated by concerns of:

    a. gender,

    b. perceived gender,

    c. gender orientation,

    d. perceived sexual orientation,

    e. sexual orientation, and

    f. gender and/or sex.

7. To the extent that some harassment and/or discrimination is motivated by one bias, and other portions motivated by other biases, all harassment, which is considered to be illegal in this case, should be considered illegal under the LAD as a total continuum of conduct,

regardless of which specific bias informed which specific act of retaliation, discrimination and/or harassment.

8. All harassment alleged herein is alleged to be especially egregious and either willfully engaged in by upper management and/or willfully ignored by upper management.

9. All harassment alleged herein is alleged to severe and/or pervasive.

10. All harassment is alleged to be "because of" one or more of the categories set forth above, inasmuch as the conduct was sexist, genderist and/or homophobic on its face and/or motivated by such concerns.

11. The workplace altered so that it became hostile and/or intimidating and/or abusive.

12. The defendant is responsible for the conduct because plaintiff consistently complained, and was consistently either ignored or retaliated against for her complaints, and/or because her complaints were mishandled and/or delayed in handling.

13. Defendant is also responsible for the conduct herein because of the willful of participation and/or ignorance by upper management.

14. Defendant is also responsible for the conduct because it failed to reasonably promulgate a policy at the Lawnside store prohibiting the conduct of which this Complaint complains.

15. The harassment began at the end of 2006, but continued, along with the retaliation for plaintiff's complaints, and the discrimination, through and including plaintiff's discharge in 2009.

16. Plaintiff thus alleges that "continuing violation" applies any and all acts of harassment, discrimination and retaliation herein.

3

17. Plaintiff has been living as a female for approximately 25 years.

18. In November of 2006, plaintiff was hired by Home Depot as an order puller and then transferred two months later into a different position.

19. At that time, plaintiff began hearing whispers and rumors around the store that she was a "man," as well as hearing rumors from other sales associates the men in the store were talking about her and making threats that they would assault her if she approached them.

20. People were coming up to plaintiff directly and commenting to the plaintiff that she should be ashamed of herself, that she was a man, etc.

21. Plaintiff complained to Naomi Jordan, from human resources, in December of 2006.

22. Ms. Jordan provided plaintiff with what purported to be an investigation of plaintiff's complaints.

23. In the report, Jordan noted that store manager, Kevin Devoy, approached Jordan and asked what procedure to utilize with regard to bathrooms for someone in the plaintiff's position, because a man had approached manager Devoy and said he was uncomfortable using the same bathroom as "it," referring to the plaintiff.

24. Jordan apparently replied to Devoy that plaintiff was using the correct bathroom, i.e., the female bathroom, but Devoy was not convinced and requested that Jordan get information on the subject.

25. Jordan apparently advised manager Devoy to stop acting upon the rumors and to stop the rumors about plaintiff.

4

26. Jordan contacted the regional human resources manager, Caroline Melamed, who instructed Jordan to contact a previous Home Depot location that plaintiff had worked at to see what information they had and if there was any problem at that location.

27. On or about December 18, 2006, a store associate named Alicia Keith made a complaint about a conversation she had overheard in a break room in which she overheard three associates talking about Ashley Hughes.

28. Ms. Keith overheard employee Oscar Alvarado say of the plaintiff, "He better not touch me."

29. Ms. Keith asked another male associate what Alvarado was talking about, and that associate, Tim Gerrish, said that "someone" had told Alvarado that plaintiff was a man.

30. Keith further replied that Gerrish was teasing Alvarado about being attracted to plaintiff.

31. Keith also reported a conversation wherein she had heard Alvarado say of plaintiff "That's nasty."

32. Keith also informed human resources that on or about December 21, 2006, she noticed the word "fag" scribbled on plaintiff's locker.

33. Jordan herself observed this and had it removed.

34. In December of 2006, on or about the 28th, Naomi Jordan interviewed Oscar Alvarado, who admitted that he had been having a conversation about plaintiff, admitted that he had been attracted to plaintiff, and that Gerrish had been teasing him about the subject, suggesting "You need to give that another look, she's a man."

35. Alvarado further admitted that he stated that she [plaintiff] had better not "touch me" either.

5

36. Because Jordan was continuing to hear rumors, she re-circulated the Home Depot policy regarding respect to all assistant store managers and department supervisors at a weekly meeting.

37. After Jordan read the policy, a department head related to her an incident to her in which an associate had said that if plaintiff came near him, he would respond with violence.

38. Upon information and belief, this associate was Bryheem Belcher.

39. Jordan interviewed Belcher on or about January 3, 2007.

40. Belcher was angry, agitated and refused to directly answer questions that were put to him.

41. Jordan was concerned that plaintiff's car had been vandalized and that the atmosphere of hostility toward the plaintiff was "not going away."

42. Jordan made the recommendation that Belcher, who appeared agitated and evasive regarding the plaintiff, should be terminated, that Alvarado should receive a disciplinary counseling, and that the respect video should be reinforced to the store.

43. Further, Jordan noted that plaintiff should have been given the option to transfer to another location.

44. Upon information and belief, however, this report was never given to anyone higher up in human resources or in the Home Depot corporate structure.

45. It is also unknown as to at what time Jordan created this report after plaintiff requested it.

46. Shortly after these events, Ms. Jordan ceased working at the Lawnside Home Depot store, though plaintiff remained.

6

47. Caroline the regional human resources manager, took over the investigation in January of 2007.

48. During this time, the comments and rumor mongering from customers and store employees, and *between customers and store employees*, continued unabated and unaddressed through 2007, 2008 and that portion of 2009 prior to plaintiff's discharge.

49. Plaintiff alleges that the constant hostility and rumor mongering continued at essentially an undisturbed and typical pace during that time.

50. Plaintiff made multiple complaints to human resources, including to Kim Hayes, the district human resources manager, to the store manager, Kevin Devoy, and to others.

51. None of these complaints were ever answered, nor was the conduct addressed.

52. At one point, in fact, when plaintiff complained to Kevin Devoy, the store manager, he asked her, if she was being harassed why was she still working there.

53. This gave plaintiff the impression that upper management, to wit, the individuals who never responded to her and the store manager who had responded with hostility to her complaint were not going to take any of her complaints seriously nor were they going to give any life or effectuation to the stated Home Depot policy allegedly prohibiting workplace harassment and/or providing a safe haven for an individual to make complaint.

54. These responses and non-responses entirely invalidate any attempt by Home Depot to argue that it had promulgated a reasonable policy prohibiting such conduct and/or a policy which protected individuals when they made a complaint about such conduct and/or which promised to deter and/or end such conduct.

55. Further, Devoy continued to retaliate against the plaintiff and continued to reprise against her with hostility.


47. Caroline the regional human resources manager, took over the investigation in January of 2007.

48. During this time, the comments and rumor mongering from customers and store employees, and *between customers and store employees*, continued unabated and unaddressed through 2007, 2008 and that portion of 2009 prior to plaintiff's discharge.

49. Plaintiff alleges that the constant hostility and rumor mongering continued at essentially an undisturbed and typical pace during that time.

50. Plaintiff made multiple complaints to human resources, including to Kim Hayes, the district human resources manager, to the store manager, Kevin Devoy, and to others.

51. None of these complaints were ever answered, nor was the conduct addressed.

52. At one point, in fact, when plaintiff complained to Kevin Devoy, the store manager, he asked her, if she was being harassed why was she still working there.

53. This gave plaintiff the impression that upper management, to wit, the individuals who never responded to her and the store manager who had responded with hostility to her complaint were not going to take any of her complaints seriously nor were they going to give any life or effectuation to the stated Home Depot policy allegedly prohibiting workplace harassment and/or providing a safe haven for an individual to make complaint.

54. These responses and non-responses entirely invalidate any attempt by Home Depot to argue that it had promulgated a reasonable policy prohibiting such conduct and/or a policy which protected individuals when they made a complaint about such conduct and/or which promised to deter and/or end such conduct.

55. Further, Devoy continued to retaliate against the plaintiff and continued to reprise against her with hostility.

56. Plaintiff was keeping note books on the incidents to which she was subjected, which Devoy stole, claiming that anything within the store was store property, and he then destroyed the evidence.

57. Devoy, upon information and belief, as an apparent and actual agency of Home Depot, willfully, intentionally and egregiously destroyed evidence in this matter, intentionally spoiling said evidence.

58. Plaintiff, found, in fact, that each time she tried to keep notes, the notes would disappear and so plaintiff finally gave up doing so.

59. A new store manager took over in the spring of 2009.

60. Plaintiff advised the store manager of the past, so that he would understand, and advised him of her particular status, so that he would understand.

61. In May of 2009, a vendor commented to someone within plaintiff's hearing that plaintiff was actually a "guy" but is "a girl" now.

62. This was said intentionally so that plaintiff could hear it.

63. Plaintiff complained to the assistant store manager and also complained to the vendor's company, and as well to the human resources manager at the store, named Pat.

64. Despite these complaints, the assistant manager, William Furman and the human resources manager did not take care of it, although they said that they would.

65. What did happened as a result of plaintiff's complaint, was that, at the end of May, she heard from Jarred, a district human resources manager, who asked the plaintiff if she thought that she "brought all of this on herself" by telling people her "business."

66. Plaintiff responded to Jarred that the harassment and discrimination had been going on since 2006 but that it had never been addressed.

8

67. People then began to rumor monger in the store that they needed to watch what they said in front of the plaintiff because she was "looking for a lawsuit."

68. Upon information and belief, at no time in the store was there any retraining or reinforcement of any policies prohibiting this type of conduct.

69. Upon information and belief, the corporation at no point reasonably promulgated and/or reasonably reinforced any policy prohibiting this conduct and/or protecting individuals who made complaint under it.

70. In May of 2009, plaintiff was falsely written up for "stealing time."

71. In June of 2009, plaintiff was fired for "attendance," offering a pretext and knowingly dishonest excuse.

72. The reason that this was known pretext was because the store policy held that an individual who was going to be paid for overtime had to cut subsequent hours in order to stay within forty hours per week.

73. The days that she was late, plaintiff was actually intentionally coming in late in order to keep her hours within forty because of having had to do extra work on the previous shift.

74. This was a common policy in the store, promulgated by, and thoroughly known to, store management and to store employees.

75. Yet, plaintiff was singled out for "being late," despite the fact that plaintiff was acting in accord with this policy, giving rise to the inference that plaintiff was pretexturally discharged and, in fact, actually discharged for engaging in complaints about the harassment to which she had been subjected.

76. Reprisals under the LAD are illegal.

77. A determinative and/or motivating factor in plaintiff's discharge was plaintiff's status under one or more of the categories set forth earlier in this Complaint and/or plaintiff's status as a complainer under the LAD.

## COUNT I

### Harassment Under the LAD

78. Plaintiff hereby repeats and realleges paragraphs 1 through 77 as though fully set forth herein.

79. For the reasons set forth above, the harassment to which plaintiff was exposed warrants the imposition of compensatory and punitive damages.

WHEREFORE, plaintiff demands judgment against the defendants jointly, severally and in the alternative, together with compensatory damages, punitive damages, attorneys' fees, enhanced attorneys' fees, interest, costs of suit and any other relief the Court deems equitable and just.

## COUNT II

### Retaliatory Discharge Under the LAD

80. Plaintiff hereby repeats and realleges paragraphs 1 through 79 as though fully set forth herein.

81. Plaintiff's discharge is knowingly false, pretextural, egregious and vexatious for the reasons set forth above.

WHEREFORE, plaintiff demands judgment against the defendants jointly, severally and in the alternative, together with compensatory damages, punitive damages, attorneys' fees, enhanced attorneys' fees, interest, costs of suit and any other relief the Court deems equitable and just.

COSTELLO & MAINS, P.C.

DATED: 9/03/09

By: _____
Kevin M. Costello

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

COSTELLO & MAINS, P.C.

By: _____
Kevin M. Costello

11

## RULE 4:5-1 CERTIFICATION

1. I am licensed to practice law in New Jersey and am responsible for the captioned matter.

2. I am aware of no other matter currently filed or pending in any court in any jurisdiction which may affect the parties or matters described herein.

COSTELLO & MAINS, P.C.

By: _____
Kevin M. Costello

## DESIGNATION OF TRIAL COUNSEL

Kevin M. Costello, Esquire, of the law firm of Costello & Mains, P.C., is hereby designated trial counsel.

COSTELLO & MAINS, P.C.

By: _____
Kevin M. Costello